## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| ORION PROPERTY GROUP, LLC, individually and on behalf of others similarly situated, | |
| Plaintiff, | |
| v. | Civil Action No. 17-2738 |
| MARK HJELLE, | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Orion Property Group, LLC, individually and on behalf of others similarly situated, brings this nationwide class action against Defendant Mark Hjelle, who is abusing his position as the Chief Executive Officer of CSC ServiceWorks, Inc. ("CSC") to execute a scheme to defraud thousands of CSC's laundry customers across the country. Under Tenth Circuit law, this misconduct is a pattern of racketeering activity and is actionable under the civil RICO Act.

In support of its Class Action Complaint, Plaintiff states as follows:

### INTRODUCTION

1.     CSC ServiceWorks, Inc. ("CSC") is the nation's leading provider of multifamily residential and commercial laundry solutions, as well as air vending services at convenience stores and gas stations, with over one million machines in service across North America and Europe.[1]

---

[1] https://www.cscsw.com/

2.      CSC's "family of companies" includes Coinmach, Mac-Gray, Air Valet, Appliance Warehouse, ASI Campus Laundry Solutions, Super Laundry, Kwik Wash, SDi Laundry Solutions, AIR-serv and Sparkle Solutions.

3.      Coinmach, which is CSC's multifamily laundry vending division, is known as one of the largest laundry machine servicing companies in the world. It started as a single laundry center in 1947 and has grown to be the largest laundry equipment service provider in the United States, maintaining equipment at more than 80,000 locations across the country.[2]

4.      Many of the laundry leases at issue in this case are between Coinmach and the class member. CSC implemented a "rebrand" recently to consolidate all of its companies under the name CSC.  As it explained[3] on an undated website posting:



**CSC ServiceWorks**

We're excited to tell you about a change that will make doing business with CSC even easier.

Over the past 10 years we have experienced tremendous growth and expanded into new industries while developing our product offerings to keep pace with your needs. To help simplify how you do business with us, while also helping you leverage our diverse line of services across the industries we now serve, we are combining several of our brands into one unified brand, CSC ServiceWorks.

**Our Brands**

- CSC ServiceWorks
- AIR-serv
- Air Valet
- Appliance Warehouse
- ASI Campus Laundry
- Coinmach
- Kwik Wash
- Mac-Gray
- SDI Laundry Solutions
- Sparkle Solutions
- Super Laundry

5.      CSC attributes its success—and exponential growth—to its "customer-first approach."[4]

---

[2] https://www.coinmach.com/about-us/

[3] https://www.cscsw.com/rebrand/

[4] https://www.cscsw.com/

6.      CSC's stated mission is to exceed industry standards by "adhering to a special set of values"[5] that include:

- **Commitment to the Customer**
  Every team member is responsible for delivering excellent experiences during every customer interaction. Members achieve this through honest, welcoming and helpful communication, and demonstrate pride through maintaining a supportive and professional disposition.

7.      On July 14, 2016, CSC's Board of Directors appointed a new Chief Executive Officer, Defendant Mark Hjelle. As stated in the press release announcing his hiring, Hjelle earned a Bachelor of Science degree in economics from the University of Pennsylvania and a law degree from the Case Western Reserve School of law.[6]

8.      Thus, Hjelle has advertised to customers and the public that he has a law degree. Any customers of CoinMach or CSC who inquired about Hjelle's background would believe that he knows the law (and is operating in his capacity as a lawyer) given the advertisement of his legal background in the press release announcing his new appointment as CEO of CSC.

9.      Also, as a trained lawyer with specialized knowledge of the law and legal consequences of misconduct, he is held to a higher standard of care.

10.     Upon his appointment as CEO, Defendant Hjelle stated: "I am very excited about joining an organization that is a clear leader in its industry with over 3,000 team members who are committed to be the very best and to constantly improve what we do every day for our clients[.]…CSC has a rich history and a strong foundation to build on and I am excited about the opportunity to lead this company into the next era of growth. I look forward to engaging with my

---

[5] https://www.cscsw.com/about-us/

[6] https://www.businesswire.com/news/home/20160714005351/en/CSC-ServiceWorks-Names-Mark-Hjelle-Chief-Executive

CSC colleagues and our clients across the company as we work together to chart our course for future growth and success."[7]

11.     Indeed, from the moment Hjelle took the helm, he has been focused on "growth" and "success." But he has lost sight of the "customer first" approach that CSC prided itself on, and has instead reverted to shortcuts to defraud and exploit CSC's customers. He is doing this to benefit CSC's bottom line and increase its operating margin, which directly benefits him because he receives higher compensation, higher bonuses, and a higher overall valuation of CSC.

12.     As so many other corporate CEOs have done so many times before, Hjelle is looking out for his own bonus (not the interests of the company) and the opportunity to quickly boost in revenue so that he can "flip" the company and exit with a massive golden parachute in hand. He won't be around to deal with the carnage inflicted by

13.     Because he cannot achieve the boost in revenues legally, he turned to illegal means to do so. In only a matter of months following his appointment, he concocted a willful and intentional scheme to defraud CSC's customers by unilaterally trying to rewrite their agreements with CSC to siphon 9.75% of their gross collections through a usurious and phony "administrative fee." In other words, he infiltrated CSC and used it as an enterprise to commit mail and wire fraud against thousands of its customers nationwide, using interstate mail and the wires in interstate commerce. That makes him personally a racketeer and liable for racketeering activity under the civil RICO Act, which Congress enacted in 1970 to deter and remedy this exact misconduct.

14.     He accomplished this through a letter he personally authored, signed, and had mailed (using the United States mail system) to every one of CSC's customers on May 17, 2017 (the "May 17 Fraud Letter").

_____

[7] https://www.cscsw.com/csc-serviceworks-names-mark-hjelle-chief-executive-officer/

15.     In his letter, Defendant lulled these customers into believing that this administrative fee was contemplated in and authorized by each customer's agreement with CSC.

16.     He further purported to provide an illusory "additional benefit" by offering coverage for events related to vandalism (up to $200), and purporting to "waive" any potential claims for costs CSC had incurred in the past that it was entitled to, but had not, deducted.

17.     Defendant knowingly concealed his fraud by orchestrating a deceptive cover-up through a website dedicated to "fee transparency." The website is included in the May 17 Fraud Letter sent to every customer: http://www.cscsw.com/feetransparency/

18.     This fraudulent scheme involved Defendant manipulating and inflating the cost of CSC's services under preexisting lease agreements between CSC and its customers.

19.     By systematically deducting 9.75% from the gross receipts due to each of CSC's customers each month, Defendant is lining his pockets and pumping up the company's bottom line, priming it for a sale. The hope is that the sale occurs before investors and CSC's board catches on to the scheme. Alternatively, CSC's board is aware of this scheme to defraud. At this stage, Plaintiff is pleading in the alternative, and either way, the scheme to defraud is the same.

20.     The ill-gotten gains of Defendant's fraudulent scheme are well-documented. CSC maintains a spreadsheet for each customer account that now details the "administrative fee" and totals up in one column the extent to which Defendant is unlawfully enriching CSC. When looking at this spreadsheet, in other words, there is a "fraud column" that perfectly details, month by month, exactly how much the scheme to defraud is costing each customer.

21.     Only by committing fraud could Defendant guarantee this instant profit. And only by hiding it in plain sight could Defendant "achieve [this] acceptable operating margin."

22.     Hjelle's scheme was intentionally designed to evade lawsuits because, as a lawyer, he knew the amounts stolen were too small to make the case attractive at the state-law level. It would require 50 individual state law class actions to be prosecuted for breach of contract or unust enrichment. And lawyers in the 50 states would not deem the case "big" enough to file suit. The civil RICO Act, however, allows Plaintiff to pursue the case nationwide, all at once, to remedy the nationwide misconduct.

23.     By a calling it an "administrative fee" (which it is not), misrepresenting that it was authorized by CSC customers' existing agreements (which it is not), touting it as resulting in a net gain to customers (which it does not), and purporting to "waive" other potential costs CSC could have but did not recoup under the agreements (which were not allowed)—including "assurance that CSC will not retroactively apply the Administrative Fee to any customer to recover for past claims,"[8] Defendant has committed intentional fraud and injured and continues to injure Plaintiff and the members of the Class.

24.     Simply put: Defendant found himself at the helm of a service-oriented company in a competitive industry. He used CSC, the long-standing relationship CSC had with its clients, and the agreements under which CSC provided services to its clients, to concoct a scheme for an instant profit margin hike of 10% on the backs of unsuspecting, uninformed customers who were not given an opportunity to renegotiate the new terms of their agreements.

25.     CSC's customers, unlike Hjelle, do not have a law degree and are not trained in reading contracts. They did not know that Hjelle was defrauding them.

26.     The administrative fee represents a grossly inflated charge not authorized under the contracts between Plaintiffs and CSC.

---

[8] https://www.cscsw.com/feetransparency/

27.     And Defendant's May 17, 2017 letter represents a false and fraudulent misrepresentation that such sums were contemplated and authorized by the agreements.

28.     Defendant's phony "administrative fee" scheme enriched Defendant, and shortchanged CSC customers of proceeds rightfully owed them under the terms of their agreements.

29.     Plaintiff brings this class action lawsuit on behalf of itself and all others similarly situated pursuant to the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, for the economic injuries that Plaintiff and other CSC Customers sustained as a result of Defendant's illegal and fraudulent scheme.

## JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 18 U.S.C. §§ 1962 and 1964 (prohibited activities; civil remedies).

31.     This Court has specific jurisdiction over Defendant because Plaintiff's injury arises directly out of defendant's conduct that is purposefully directed toward Plaintiff and other citizens of this District. Indeed, Hjelle purposefully mailed the May 17 Fraud Letter to Plaintiff in Kansas, along with countless other May 17 Fraud Letters to other residents (customers) in Kansas.

32.     Venue is proper in this Court because Plaintiff is a resident of Kansas. *See* 28 U.S.C. § 1391(b)(1). In addition, venue is proper because a substantial part of the events occurred in this District and the wire and mail fraud was directed to Plaintiff in this District. *See id.* § 1392(b)(2).

## THE PARTIES

### A.    Plaintiff

33.    Plaintiff Orion Property Group, LLC is a property management limited liability company organized under the laws of the state of Kansas, with its headquarters in Overland Park, Kansas.  Plaintiff manages properties in over twenty states across the country, including in Kansas, Missouri, the District of Columbia, and Maryland.[9] Plaintiff has signed a lease agreement with CSC (including Coinmach), which maintains and operates vend-based laundry equipment at Plaintiffs' properties. Plaintiff appears as the "authorized agent" and signed the lease with CSC on behalf of the building owner for which Plaintiff operates as the agent. All invoices and letters are sent to Plaintiff's mailing address in Overland Park, Kansas, which is in the District of Kansas. Plaintiff regularly received invoices and payments from CSC on behalf of the Chequers Apartments and the Fairway Hills Apartments.

### B.    Defendant

34.    Defendant Mark A. Hjelle is the Chief Executive Officer of CSC ServiceWorks, Inc., a Delaware Corporation, headquartered at 303 Sunnyside Blvd., Ste 70, Plainview, New York 11803. Defendant has served in that official capacity since July 2016.[10] Defendant's employer, CSC, is registered to do business in the State of Kansas and has consented to jurisdiction in this State and this District. Defendant drafted, signed, and arranged the mailing of the May 17 Fraud Letter to several victims in the District of Kansas, including Plaintiff. Defendant is a citizen of Maryland, and can be served at his personal address: 17508 Ashton Forest Ter., Sandy Spring, Maryland 20860.

---

[9] http://www.orionpg.com/listing-locator/

[10] https://www.cscsw.com/csc-serviceworks-names-mark-hjelle-chief-executive-officer/

## FACTUAL ALLEGATIONS

**A.     CSC's Laundry Leases with Plaintiffs.**

35.     Today's laundry vending industry is a dynamic and competitive market of ever-changing players. CSC has perhaps the largest share of the U.S. market, although their presence is concentrated in the northeast.

36.     Like its competitors, CSC operates and maintains laundry equipment centers in multi-family residential properties and commercial spaces (through subsidiaries Coinmach, Mac-Gray, SDi Laundry Solutions (New York only), Sparkle Solutions (Canada only)) and college campuses (through subsidiary ASI Campus Laundry).

37.     CSC and its competitors refer to these vending center leases or properties as "routes." The number of machines per "route" varies, depending on the property.

38.     Many laundry vending companies, including CSC, lease or rent in-unit equipment directly to residents (through subsidiary Appliance Warehouse). CSC and its competitors refer to these non-vending in-unit equipment leases as "domestics."

39.     CSC also owns and operates stand-alone vend-based laundry centers (through subsidiary Kwik Wash).

40.     Plaintiff and the Class are customers of CSC, which maintains and operates vend-based equipment in laundry centers in multi-family residential properties and commercial spaces.

41.     CSC leases space from owners of apartment buildings and other small business entities like Plaintiff for the purpose of installing, maintaining and operating coin-and/or card-operated laundry equipment.

42.     In exchange for the lease of the space, Coinmach pays Plaintiffs and its other lessors "rent," set out as a portion of the money collected from the laundry equipment.

43.     These leases are versions of CSC's standard laundry room lease agreement (the

"Standard Leases"), which set forth the amount of rent to be paid, along with other terms.

44.    These lease agreements structure "rent" in a number of different ways: the Plaintiff-lessee may receive a straight percentage of the gross receipts collected per month; or may receive a flat monthly fee plus a percentage of gross monthly receipts; or a minimum "rent" per machine based on its vend price or gross monthly revenue; or may receive a "first vend" sum (say, the first $1.00 or the first vend of each machine in the unit per day) plus a percentage of gross collection.

45.    Most commonly, the Standard Leases provide for rent in the form of a percentage of gross monthly receipts, often fifty percent.

46.    The Standard Leases generally set out the price at which each machine will be "coined" (for example, washers coined at $1.25 per vend and dryers coined at $1.00 per vend).

47.    The Standard Leases generally specify if the vend prices or any portion of the rent will be indexed (i.e., to a consumer price index or "CPI"), or whether the amounts are subject to change only by agreement of the parties and amendment of the contract.

48.    The Standard Leases generally specify terms and coverage for routine and emergency maintenance, service; coverage for theft, vandalism, replacement; and may contain other provisions such as automatic lease renewal, substantial replacement clauses, etc.

49.    And the Standard Leases contain a clause providing that the lease is the entire agreement between the parties and may not be modified except through a writing signed by both parties.

50.    The Plaintiff property owners/managers benefit from this arrangement because they can offer their residents on-site laundry facilities, and they can outsource the provision of such services (including installation, operation, and maintenance of the laundry space and equipment) to a specialized entity.

51.     Unfortunately, because the entity that owes rent under the lease is the entity responsible for collecting and accounting for the gross receipts, there is a great deal of trust placed in CSC to engage in ethical, reliable, and transparent accounting and collection practices. Plaintiff and the Class are wholly dependent on CSC to operate their facilities in accord with the lease terms in a responsive manner and to account for receipts in an honest and transparent fashion.

52.     Finally, given the uncertainties and variables in the market, the success of the arrangement depends in large part on how the lease is structured. These "routes" can vary from slim-margin or even "in the red" operations to extremely lucrative profit centers for CSC.

53.     CSC has grown through significant acquisitions. CSC itself has been bought/sold/restructured numerous times.

**B.      Dropping a Bomb: The May 2017 Fraud Letter**

54.     In May 2017, Orion Property Group's Principal and President, Michael Navopanice, received the May 17 Fraud Letter from Mark Hjelle.

55.     As one of CSC's competitors stated at the time, this letter was "'like a bomb went off' in the industry. No one was doing anything like this. I ran it by our corporate counsel and he said, 'they can't do this.'"

56.     As Hjelle knew and his lawyers knew, the administrative fee was a fraud scheme implemented with surgical precision. It was knowingly executed by Hjelle to goose CSC's revenues, and he knew that the customers would be powerless to stop him because CSC collected and controlled all the revenues.

57.      By unilaterally imposing a phony "administrative fee" that is not authorized under the lease agreement between CSC and Plaintiff, Hjelle defrauded Plaintiff and other members of the class and has been illegally stealing 9.75 of gross receipts from Plaintiffs every

month since May 2017.

## USE OF INTERSTATE MAILS AND WIRES TO CAUSE INJURY TO PLAINTIFFS AND THE CLASS

58.     The scheme alleged herein constitutes mail and/or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

59.     Each letter signed and sent by Defendant through the mail contained multiple misrepresentations, and constituted a unilateral attempt to wrongfully amend, alter, modify, or breach the terms of the lease between CSC and its customers, including Plaintiff.

60.     The conduct of Defendant as described in this complaint constitutes the execution of a scheme to deprive CSC's customers, including Plaintiff, of compensation properly due to them under the terms of their leases with CSC by means of fraudulent pretenses and representations through the use of the United States mail, in violation of 18 U.S.C. § 1341.

61.     Defendant's use of the mails formed a central feature of the scheme and, by way of example and as described above, included sending the initial letter, as well as subsequent monthly statements, and payments through wire that reflected the 9.75% administrative fee deduction. Hundreds, and likely many thousands, of such statements and payments were sent to CSC customers through the mails and wires every month.

62.     Every monthly statement and payment perpetuated the fraud set out in Defendant's letter by deducting a 9.75% "administrative fee" not authorized under the lease agreements between CSC and its customers.

63.     The mail fraud was uniform and constituted a financial transaction based on a lease; every lease included the integration clause stating that the lease constituted the entire agreement between the parties. Thus, all of the customers were harmed and defrauded commonly and in the same method and manner by Defendant.

64.     Moreover, Defendant made fraudulent and untrue statements regarding the fee itself in an effort to lull customers into believing that it reflected a legitimate cost authorized under existing lease terms rather than the scheme alleged herein.

65.     The conduct described above constituted multiple violations of t h e  mail fraud statute, 18 U.S.C. § 1341, which is a predicate of the civil RICO Act, 18 U.S.C. §1962(c).

66.     In addition, Defendant has, on a monthly basis, transferred payments to customers by wire, which represented unlawful payments under the terms of the lease. This conduct constitutes serial and regular acts of wire fraud, 18 U.S.C. § 1343, which is a predicate offense of RICO for purposes of 18 U.S.C. § 1962(c).

67.     At all relevant times, Defendant owed legal duties to CSC's clients, and legal and fiduciary duties to CSC. In all cases, those duties included adhering to the terms of the leases with CSC's clients, and conducting business in a transparent and ethical manner.

## CLASS ACTION ALLEGATIONS

68.      Plaintiff brings  this  action individually and,  pursuant  to Federal Rule of Civil Procedure 23(a) and (b)(2) and (b)(3), as representative of a Class defined as follows:

> All customers of CSC that have been subject to a 9.75% "administrative fee."
>
> Excluded from the Class are: (1) all presiding judge(s) together with their immediate family members; and (2) Defendant and CSC and their f a m i l y  m e m b e r s ,  affiliates, their predecessors-in-interest, and their respective employees, officers, and directors.

69.     The Class is so numerous that joinder of all members is impracticable.

70.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

71.     Plaintiff's claims are typical of the claims of the Class. As alleged herein,

Plaintiff and members of the Class all sustained damages arising out of the Defendant's common course of unlawful conduct.

72.     There are questions of law and fact common to the Class, including but not limited to:

- Whether Defendant engaged in a scheme to defraud to impose a phony "administrative fee" unauthorized by the terms of the standard leases between Coinmach and Plaintiff and the class;

- Whether Defendant infiltrated CSC (the enterprise);

- Whether CSC is an enterprise;

- Whether Defendant engaged in a pattern of racketeering activity;

- Whether Defendant's scheme has resulted in the improper deduction or withholding of rent owed to Plaintiff and Class members;

- Whether Defendant was the "cause in fact" of the harm to the Class;

- Whether Plaintiff and Class members have suffered damage as a result of Defendant's conduct; and

- The appropriate measure of damages.

73.     Class action status is warranted under Rule 23(b)(2) because Defendant has acted on grounds generally applicable to the Class thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

74.     Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

75.     Plaintiff anticipates no difficulty in the management of this matter as a class action.

## CAUSES OF ACTION

### COUNT ONE
### Violation of the RICO Act, 18 U.S.C. §§ 1961-1968

76.     Plaintiff incorporates the preceding allegations by reference.

77.     Plaintiff, each member of the Class, and Defendant are "persons," as that term is defined in 18 U.S.C. §§ 1961(3) and 1962(c).

### The Enterprise

78.     The enterprise is CSC, the corporate entity used by Defendant as a vessel to execute the scheme to defraud.

79.     The Enterprise is separate and distinct from Defendant because CSC is a corporate entity with different rights and responsibilities from Defendant, who is a natural person and the CEO of CSC.

80.     As described above and below, Defendant infiltrated CSC (the enterprise) and used it to engage in a scheme to defraud the customers of CSC who had signed leases.

81.     At all relevant times, the Enterprise was engaged in, and its activities affected, interstate commerce.

### The Pattern of Racketeering Activity

82.     At all relevant times, in violation of 18 U.S.C. § 1962(c), the Defendant used the enterprise (CSC) as a vessel to commit a pattern of racketeering activity, 18 U.S.C. § 1961(5), by virtue of the conduct described in this Complaint.

83.     The Defendant has conducted the affairs of the Enterprise and participated in the operation and management thereof at least through the following conduct:

a.  Defendant intentionally and deliberately engaged in a pattern of conduct of by drafting and signing the May 17 Fraud Letter with the intent and purpose of

15

appropriating portions of the proceeds rightfully owed to Plaintiffs as rent under their agreements for itself.

b.  As the one signing the letter, Defendant made clear that the May 17 Fraud Letter was his idea and he was the one orchestrating and masterminding the scheme to defraud.

c.  Defendant knew that the administrative fee was far in excess of any actual administrative cost and that it was not authorized under any of the leases or agreements in place.

d.  Defendant also knew that the administrative fee was not authorized under the standard lease between Coinmach and its customers. His inability to cite a specific provision of any lease agreement confirms that he knew, with scienter, that he was engaging in fraud and that his sudden deduction of 9.75% (which had never been taken before by CSC) was fraud.

e.  Defendant also knew that the additional promises of benefits set out in his letter were illusory.

f.  Defendant orchestrated an entire website (www.cscsw.com/feetransparency) to lull and trick the customers of CSC into believing this fraud was permitted.

84.     The unlawful conduct by Defendant, which he committed using the enterprise (CSC) as a vessel for his fraud, deprived thousands of customers of their rightful lease payments.

85.     This conduct is continuous and open-ended, and was intended to continue, and does continue, to this day. Month after month, the fraud continues coast to coast.

86.     Plaintiff and the members of the Class are the intended targets of the scheme to defraud. The financial harms suffered by Plaintiffs and members of the Class are the direct result

of that conduct and were the intended and reasonably foreseeable consequence of such conduct.

87.     The pattern of racketeering activity consisted of mail and/or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

88.     Specifically, Defendant engaged in an intentional scheme to defraud customers through false or fraudulent pretenses, representations, and promises.

89.     Each monthly statement and payment, mailed and/or wired month after month, was fraudulent and deceptive because Defendant did not disclose that the fee was unauthorized by the lease agreements.

90.     Nor did Defendant reveal to CSC's customers that the administrative fee was far in excess of a reasonable rate and that this was done specifically to enrich Defendant and prop up the scheme to defraud.

91.     Nor did Defendant reveal to Coinmach customers that the additional benefits promised in his letter and spelled out in the cover-up website were illusory and served only to lull CSC's customers into accepting the legitimacy of the fraud.

92.     It was reasonably foreseeable to the Defendant that the mails and/or wires would be used in furtherance of the scheme, and the mails and/or wires were in fact used to further and execute the scheme.  The U.S. mails were used on or about May 17, 2017, to mail the letter to each CSC customer. The U.S. mails are used every month to send the monthly statements to each customer, and the wires are used every month to wire the payments.

93.     Each mailing and each wire payment constitutes a separate act of mail or wire fraud.

94.     Intrastate use of the mails is sufficient to constitute mail fraud, and statements and payment was mailed and or wired to Coinmach customers across the country.

95.     The nature and pervasiveness of the Enterprise necessarily entailed frequent wire and/or mail transmissions. Defendant utilized the mails and/or wires for the purpose of furthering and executing the scheme.

96.     Defendant participated in the scheme to defraud knowingly, willfully, and with a specific intent to defraud CSC's customers into bearing the cost of an unauthorized, falsely inflated, unauthorized fee in violation of their lease agreements with CSC.

97.     The predicate acts of mail and wire fraud constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5). The predicate acts were not isolated events, but were related acts aimed at the common purpose and goal of defrauding customers to pay them less than the amounts due them under the lease agreements with CSC, thereby enabling Defendant to reap illicit profits.

### Injury to Plaintiff and the Class

98.     As a direct and proximate result of Defendant's violations of 18 U.S.C. § 1962(c), Plaintiff and the Class have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c).

99.     Plaintiff and the Class are and were the direct and only victim of the scheme to defraud, and no other group of plaintiffs or victims is better positioned to bring this suit. There is a direct and single line from the fraud committed by Defendant to Plaintiff and the Class.

100.     Plaintiff and the Class had proceeds withheld from rent owed to them, on account of an unauthorized, unilaterally imposed, falsely inflated, and altogether phony administrative fee by reason, and as a direct, proximate, and foreseeable result, of the scheme alleged. Plaintiff's and the Class's continued deprivation evidence their reliance on the Defendant's misstatements.

101.     Moreover, the May 17 Fraud Letter introducing the fee and the website dedicated

to explaining it are an integral and necessary part of the scheme, as they effectuated the fraud by lulling Plaintiffs into a false sense of security about the fee's legitimacy.

102.     Under the provisions of 18 U.S.C. § 1964(c), Defendant is liable to Plaintiff and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendant and in favor of Plaintiff and the members of the Class and award the following relief:

A.     Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23; direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2) be given to the Class; and declare that Plaintiff is the representative of the Class and Plaintiff's counsel are counsel for the Class;

B.     Require Defendant to pay for sending notice to the certified class of all CSC customers per their business records;

C.     Declare, adjudge and decree that the conduct alleged herein is unlawful;

D.     Enjoin Defendant from engaging in the conduct alleged herein;

E.     Award other injunctive relief as the Court deems appropriate;

F.     Award compensatory, consequential, and general damages in an amount to be determined at trial;

G.     Award treble damages;

H.     Award costs and disbursements of the action;

I.     Award restitution and/or disgorgement of Defendant's ill-gotten gains, and the imposition of an equitable constructive trust over all such amounts for the benefit of the Class;

J.      Award pre- and post-judgment interest;

K.      Award reasonable attorneys' fees and costs;

L.      Award punitive damages; and

M.      Award all such other and further relief as may be just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff and the Class demand trial by jury on all issues so triable in Kansas City, Kansas.

Respectfully submitted,

/s/ Ryan C. Hudson
Rex A. Sharp, KS # 12350
Ryan Hudson, KS # 22986
REX A. SHARP, P.A.
5301 W. 75th Street
Prairie Village, Kansas 66208
Tel: 913-901-0505
Fax: 913-901-0419
rsharp@midwest-law.com
rhudson@midwest-law.com

Brennan P. Fagan  KS # 20430
FAGAN EMERT & DAVIS, L.L.C.
730 New Hampshire Street, Suite 210
Lawrence, KS 66044
Tel: 785-331-0300
Fax: 785-331-0303
bfagan@fed-firm.com

William J. Skepnek    KS # 10149
SKEPNEK LAW FIRM
One Westwood Road
Lawrence, KS 66044
Tel: 785-856-3100
Fax: 785-856-3099
bskepnek@skepneklaw.com

**ATTORNEYS FOR PLAINTIFFS**